**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

RAFAEL AGUILA, an individual,
3253 S.W. 25th Street
Miami, FL 33155
Telephone: 786-633-2008,
E-mail: support@510k-review.com,

ACCELERATED DEVICE APPROVAL
SERVICES, a sole proprietorship,
3253 S.W. 25th Street
Miami, FL 33155
Telephone: 786-633-2008,
E-mail: support@510k-review.com,

                                        Plaintiffs,

                v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, D.C. 20201,

XAVIER BECERRA,
Secretary of Health and Human Services,
200 Independence Avenue, SW
Washington, D.C. 20201,

U.S. FOOD AND DRUG ADMINISTRATION
10903 New Hampshire Avenue
Silver Spring, MD 20993,

ROBERT CALIFF,
Commissioner of Food and Drugs,
10903 New Hampshire Avenue,
Silver Spring, MD 20993,

                                        Defendants.

Case: 1:23-cv-03660 JURY DEMAND
Assigned To : Jackson, Amy Berman
Assign. Date : 12/8/2023
Description: Pro se. Gen. Civ. (F-Deck)

Civil Action No._____

Demand for Jury Trial

**COMPLAINT**

RECEIVED

DEC - 8 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

The Plaintiffs, Rafael Aguila ("Aguila") and Accelerated Device Approval Services ("ADAS"), hereby allege the following:

## INTRODUCTION

1.      In this case, the Plaintiffs contend that their due process rights, as defined in 21 U.S.C. § 360m(b)(2)(B), were violated when FDA's Center for Devices and Radiological Health (CDRH) revoked their "Accredited Persons" status in the 510(k) Third Party Review Program. The revocation, as stated in the Final Order dated August 13, 2023, deprived them of their constitutional right to argue their case in a hearing. The Plaintiffs argue that this action stripped them of a significant property interest, protected under the Fifth Amendment, without due process. They highlight a lack of opportunity to challenge CDRH's claims in an evidentiary hearing. Despite CDRH citing 21 C.F.R. § 16.26 and federal summary judgment standards, which refer to the absence of substantial material factual disputes, the Plaintiffs maintain that critical factual disagreements existed that warranted a hearing. Moreover, they point out that no CDRH official signed any affidavit or declaration in the administrative record, and that CDRH´s evidence is not legally sufficient to support a finding of wrongdoing by ADAS. By proceeding with the revocation without resolving these disputes, CDRH is accused of neglecting to provide the hearing mandated by due process rights.

2.      The Plaintiffs argue that CDRH violated 21 U.S.C. § 360m(b)(2)(D)(ii) by failing to process their re-accreditation application within the mandated 60-day timeframe, resulting in a delay of 128 days beyond the deadline. Initially, Greg Pishko, former Assistant Director of CDRH's 510(k) Third Party Review Program, cited COVID-19 complications as the reason for this delay in a communication dated November 9, 2020. However, this justification was called into question as other Accredited Persons received timely re-accreditation within the same period. Further undermining Pishko's claim is the fact that he was awaiting a declaration from Konrad Kobel against the Plaintiffs, signed only on February 27, 2021. The rejection of the Plaintiffs' re-accreditation by Pishko on March 17, 2021, a mere 18 days after Kobel's declaration and amid the peak of the COVID-19 pandemic, significantly undermines the credibility of his initial explanation. The noticeable discrepancy in processing times for the Plaintiffs compared to other Accredited Persons suggests a discriminatory and deliberately extended delay by Pishko, indicating an intentional breach of the statutory deadline. The stark discrepancy between Pishko's professed reasons for delay, and the evident underlying motives, casts substantial doubt on the credibility of his COVID-19 related justification, intimating a likelihood of bad faith conduct.

3.    The Plaintiffs are seeking recourse for the harm caused by the misconduct of Pishko, who spearheaded the investigation against them. Pishko was subsequently removed from his position as Assistant Director on August 16, 2021, a mere three days after the revocation of the Plaintiffs' accreditation on August 13, 2021. Pishko's removal was purportedly due to violations of CDRH guidelines and improper conduct in his dealings with the Plaintiffs. Notably, Pishko's investigation was both motivated by improper animus and initiated in a retaliatory manner, thereby violating the precepts of equal protection. The retaliatory nature of the investigation becomes evident when considering its timing: Pishko commenced the investigation against the Plaintiffs only after receiving a complaint on February 19, 2020, from Anna Reifschneider, who is Aguila's wife, alleging sexual harassment and misgendering. Consequently, the Plaintiffs are seeking not only the reinstatement of their wrongfully revoked accreditation, but also compensation for the ensuing damages. Pishko's conduct, characterized by malfeasance, has tarnished the Plaintiffs' professional reputation. This legal action is essential to rectify the impact of Pishko's abuse of power in a position where impartiality and ethical conduct are paramount.

4.    Aguila's commitment to patient safety is highlighted by his discovery of a significant flaw in Philips's IntelliVue patient monitors, a defect linked to the tragic deaths of at least 20 patients. Despite being aware of the severity of this issue, Philips decided against addressing it in their older models, which are still operational in numerous U.S. hospitals, thereby blatantly ignoring the risks to patient safety. This neglect contrasts starkly with Aguila's sense of urgency and responsibility. In a critical meeting on November 2, 2023, with Philips's manager, Ulrich Weiss, Aguila directly addressed the issue, but Weiss displayed an alarming lack of concern regarding the preventable deaths caused by the IntelliVue's defect. Aguila, realizing that Philips was unlikely to recall the defective monitors voluntarily, took the initiative to report this safety issue to CDRH. This proactive step garnered recognition from Dr. Loriano Galeotti, a leading patient safety expert at CDRH. On November 15, 2023, Galeotti praised Aguila for his integrity and commitment to patient safety, writing, "I also want to thank you for your integrity and your efforts to ensure the safety of the patients." This commendation from a CDRH authority not only affirms Aguila's dedication, but also highlights the impact of his actions in advocating for patient safety.

5.    In their Final Order, CDRH accuses the Plaintiffs of misrepresenting CDRH's involvement in the 510(k) review of Cryptych's NuroChek device. However, this accusation overlooks important facts: On February 5, 2020, the Plaintiffs raised safety concerns about NuroChek, but

Cryptych delayed inquiring about the identity of the reviewer until February 13, 2020, even though they were aware the review was being conducted by the Plaintiffs, not by CDRH. Furthermore, subsequent revelations about Cryptych's practices incite mistrust on their integrity. They illegally marketed the NuroChek as a concussion diagnostic tool, and excluded individuals with "dread-locks" from their safety study, failing to disclose this information to the Plaintiffs before their favorable recommendation on March 18, 2020, which contributed to NuroChek's 510(k) clearance on April 23, 2020. Additionally, Cryptych's illicit recording of a teleconference with CDRH and the Plaintiffs, violating privacy laws in both Maryland and Florida, questions their trustworthiness and undermines CDRH's decision to rely on such a questionable source in their action against the Plaintiffs.

6.     CDRH's claim that the Plaintiffs used a fictitious reviewer, Kobel, is weakened by multiple factors. Firstly, Kobel's statement that he never met any ADAS personnel, a claim that is easily contradicted by documented evidence of his March 2013 meeting with Aguila at Aesculap AG, Germany, which was also attended by Peter Winterhalter. This documented prior encounter directly contradicts Kobel's assertion of having no previous interactions, thus undermining the credibility of his declaration. Secondly, Kobel's role in a 2011 CDRH Warning Letter about mis-branded brain aneurysm clips at Aesculap AG, calls into question his reliability. Additionally, the sophisticated use of English in Kobel's declaration, characterized by intricate legal jargon, does not align with his limited English language abilities. The absence of a notarization on Kobel's declaration further questions its legitimacy. Moreover, Kobel's own acknowledgment of not par-ticipating in 510(k) submissions at Aesculap AG, directly counters CDRH's statements about dis-crepancies in his signature on such documents.

7.     The credibility of CDRH's Final Order is also undermined by simple factual errors in its contents, notably regarding the timeline of events. The Order states, "[i]t is undisputed, how-ever, that ADAS did not submit a 510(k) package to FDA regarding NuroChek until *March 19, 2020*," (emphasis added). However, this assertion conflicts with the official 510(k) database main-tained by CDRH itself, which records the official submission date for the NuroChek 510(k) as March 18, 2020, not March 19, 2020. This discrepancy, albeit small, highlights a lapse in CDRH's accuracy and attention to detail in their case against the Plaintiffs. The presence of such a basic factual error raises questions about the thoroughness and reliability of CDRH's adjudication pro-cess, and suggests that other, more significant errors might be present in their findings.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction under 28 U.S.C. § 1331, which pertains to civil actions arising from the Constitution, laws, or treaties of the United States. Jurisdiction is also grounded in the Federal Tort Claims Act (FTCA), as outlined in 28 U.S.C. §§ 1346(b) and 2671-2680, addressing claims involving harm due to the negligent or wrongful acts of federal employees in their official roles. Additionally, the Court is empowered to grant declaratory relief under 28 U.S.C. § 2201(a). The revocation of the Plaintiffs' accreditation by CDRH on August 13, 2021, constitutes an arbitrary and capricious action, as well as an abuse of discretion, within the meaning of the Administrative Procedure Act (APA), specifically under 5 U.S.C. §§ 701-706. This decision can be categorized as a reviewable agency action under the APA, thereby permitting judicial review to assess the legality and appropriateness of CDRH's actions in this matter. Moreover, CDRH's failure to meet the hearing requirement mandated under 5 U.S.C. § 557 affirms the Court's jurisdiction.

9.     The venue is correctly established in this Court under 28 U.S.C. § 1391(e), applicable for lawsuits seeking relief from federal agencies and officials in their official capacities. The presence of some Defendants in this district, along with the occurrence of actions or omissions related to the claim in this district, justifies the choice of venue.

## PARTIES

**Plaintiffs**

10.     Plaintiff RAFAEL AGUILA was an "Accredited Person" under 21 U.S.C. § 360m, fulfilling all necessary qualifications, including the stipulation of not being a Federal Government employee as per 21 U.S.C. § 360m(b)(3). Aguila's distinctive role stems from his dual capacity: as the sole proprietor of Accelerated Device Approval Services (ADAS), a legally established entity, and as the "Responsible Third-Party Official" for ADAS. This dual role is particularly relevant in the context of the events leading to the revocation of his accreditation by CDRH on August 13, 2021. In his role at ADAS, Aguila had multiple responsibilities. He was not only the owner, but also actively engaged in evaluating new medical devices for CDRH as an Accredited Person. His extensive expertise and unwavering dedication to regulatory compliance and patient safety were integral to upholding the integrity of the device safety review process.

11.     Plaintiff ACCELERATED DEVICE APPROVAL SERVICES, commonly known as "ADAS," is a sole proprietorship founded, owned, and operated by Rafael Aguila. Registered in

Florida and based in Miami-Dade County. Before August 13, 2021, ADAS had full control of its subsidiary, ADAS LLC. From August 20, 2018, to August 13, 2021, ADAS operated as an "Accredited Person" under 21 U.S.C. § 360m, serving in the capacity of a Third-Party Review Organization ("3PRO") accredited by CDRH. The primary function of ADAS during this period was to conduct comprehensive assessments of new medical device submissions. This process encompassed a thorough review, resulting in ADAS providing recommendations to CDRH about the clearance of these new medical devices. As a sole proprietorship, which is legally indistinct from its owner, ADAS is representing itself in this legal action, in accordance with 28 U.S.C. § 1654.

**Defendants**

12.     The United States Department of Health and Human Services is an executive department of the U.S. Government, headquartered in Washington, D.C. HHS holds ultimate responsibility for the oversight of FDA. As a critical arm of the federal government in matters of public health, HHS's actions and policies are central to the matters at issue in this lawsuit.

13.     Defendant Xavier Becerra is named in his official capacity as the Secretary of the United States Department of Health and Human Services (HHS). Secretary Becerra, in this role, holds supervisory authority over FDA, and the "Accredited Persons" program administered therein. His official capacity as Secretary implicates him in matters pertaining to the administration and oversight of these entities, particularly concerning the issues raised in this case.

14.     The Food and Drug Administration is an Agency that operates under the umbrella of the HHS. Within FDA, the Center for Devices and Radiological Health (CDRH) is the branch specifically tasked with the premarket approval and regulatory oversight of medical devices. CDRH's role and decisions are pivotal to this case, especially concerning the accreditation and regulation of new medical device evaluators known as "Accredited Persons".

15.     Defendant Robert Califf, M.D., is named in his official capacity as the Commissioner of Food and Drugs. Dr. Califf's role endows him with comprehensive authority and responsibility over FDA's operations. This includes overseeing the "Accredited Persons" program and the relevant statutes and regulations discussed in this case.

16.     Both the HHS and FDA are recognized as agencies as defined under the Administrative Procedure Act (APA), 5 U.S.C. § 701(b)(1).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.     This lawsuit focuses on the decision by CDRH on August 13, 2021, which denied a hearing request and resulted in the revocation of the Plaintiffs' "Accredited Persons" status in the Third-Party 510(k) Review Program. As stated in the Final Order, CDRH declared: "[p]ursuant to section 523(b)(2)(B), I am withdrawing ADAS's accreditation from the 3P510k Review Program." This statement represents a definitive Agency action as per 5 U.S.C. § 704, and represents a conclusive action wherein rights and responsibilities were definitively determined, thereby triggering the Plaintiffs' need to seek judicial review.

18.     The Plaintiffs diligently pursued and exhausted all relevant administrative remedies available. In cases where some channels were underutilized, it was due to their inadequacy or irrelevance to the Plaintiffs' specific challenges. Their decision to cease further administrative proceedings stemmed from recognizing that these efforts would not achieve the goals of administrative exhaustion. Consequently, seeking judicial intervention is based on understanding that continued administrative engagement would not provide the corrective actions or clarifications needed to address their grievances.

19.     The Plaintiffs confront a dearth of adequate legal remedies, as delineated in 5 U.S.C. § 704. The repercussions of the accreditation revocation transcend mere financial losses, profoundly affecting essential aspects of the organization's operations. These include the Plaintiffs' reputation and their capacity to engage in the regulatory sector. Considering these impacts, judicial intervention becomes indispensable. This Court is thus positioned as the most suitable forum to address and rectify the multifarious grievances arising from CDRH's conclusive Agency decision.

20.     The sequence of relevant events in this case began with CDRH issuing a 'Notice of Intent to Withdraw Accreditation' on March 12, 2021 ("CDRH's Notice"). This action prompted the Plaintiffs to file an appeal and a formal hearing request on March 26, 2021. In response, CDRH submitted an opposition to the hearing request on April 15, 2021 ("CDRH's Opposition"). The Plaintiffs then submitted their reply on April 27, 2021. On August 13, 2021, CDRH issued a final decision to deny the hearing request and revoke the Plaintiffs' accreditation ("Final Order").

21.     Moreover, CDRH ultimately rejected ADAS's application for re-recognition on March 17, 2021, exceeding the statutory deadline to make a decision by 128 days. ADAS then filed a request for reconsideration on May 16, 2021. CDRH maintained its original position and confirmed the denial of re-recognition for ADAS on August 20, 2021.

## CDRH'S PROCEDURAL VIOLATIONS IN THE CASE

### Misapplication of Summary Judgment Standards by CDRH

22.     The Final Order revoking the Plaintiffs' accreditation without a hearing, improperly applies federal court summary judgment standards. The Order asserts: "[t]he standard for denial of a hearing under 21 C.F.R. § 16.26(a) *aligns with the standard in federal court for summary judgment.*" (emphasis added). Yet, this comparison is flawed, particularly since Denise M. Hinton, the author of the Order, lacks formal legal training and is not an Administrative Judge.[1] Hinton's inability to accurately interpret and apply summary judgment principles raises serious concerns.

23.     Hinton's decision to refuse the Plaintiffs' hearing request, grounded in the application of Rule 56 of the Federal Rules of Civil Procedure (FRCP), is marked by substantial procedural shortcomings. These deficiencies are particularly evident in the failure to adequately consider key evidence and counterarguments put forth by the Plaintiffs. A glaring omission in Hinton's analysis is Aguila's signed declaration from April 27, 2021, which contests CDRH's narrative that the Plaintiffs misled Cryptych, yet Hinton conspicuously fails to address it in the Order.

24.     Additionally, in their March 26, 2021, 'Request for a Hearing', the Plaintiffs provided detailed assertions that directly challenged numerous CDRH claims, including the allegation that the Plaintiffs misled Cryptych regarding the status of their 510(k) submission before March 18, 2020, and allegations about Kobel. Hinton also failed to address critical factual disputes raised by the Plaintiffs, including the retaliatory nature of Pishko's investigation following Reifschneider's complaint of sexual harassment and misgendering.

25.     CDRH's failure to provide necessary affidavits or declarations from officials like Pishko, as mandated by FRCP 56(c), undermines the procedural integrity of the case. The absence of such vital documentation, essential for corroborating CDRH's claims, thereby raises serious doubts about the foundation and reliability of their claims. This crucial omission impairs both the credibility and legality of Hinton's decision. Furthermore, the procedural lapses, coupled with a discernible bias, violate the principles of fairness and impartiality outlined in FRCP Rule 56(e), leading to Hinton's decision being justifiably characterized as 'arbitrary, capricious, and an abuse of discretion' under APA standards.

---

[1] According to the HHS website, Hinton earned a Bachelor of Science in Nursing from Florida State University, and a Master of Science from Boston University.

26.    The Final Order overlooks numerous other key contested facts that are critical to the case, including:

a)    The dismissal of Pishko from his position as Assistant Director of CDRH's 510(k) Third-Party Review Program, for misconduct towards the Plaintiffs, which occurred a mere three days after the Final Order's issuance. This event, reportedly unknown to Hinton during the Final Order's drafting, raises substantial questions regarding the Order's integrity and credibility.

b)    The removal of Pishko as Assistant Director, prompted by allegations of sexual harassment and misgendering of Reifschneider on February 19, 2020, raises questions about the validity of his subsequent investigation of the Plaintiffs. The initiation of the probe into ADAS and Kobel, immediately following Reifschneider's complaint, suggests possible bias or retaliatory motives, thus compromising the investigation's impartiality and fairness. Additionally, Pishko's lack of denial to Reifschneider's allegations, in his email response on February 20, 2020, questions the ethical integrity of his actions in the case against the Plaintiffs.

c)    The alteration in the Final Order by CDRH of a quote from the Plaintiffs' email to Cryptych, specifically by adding the word 'CDRH' next to 'reviewer' in an email dated February 5, 2020, distorts the original intent of the Plaintiffs´ email its meaning. CDRH created an impression that the Plaintiffs had deceived Cryptych by suggesting that CDRH's internal in-house reviewers, instead of ADAS reviewers, were conducting the 510(k) review.

d)    FDA's previous description of Third-Party reviewers as "FDA reviewers" supports the Plaintiffs' assertion that this terminology was in line with FDA's usual regulatory terminology, thereby contradicting CDRH´s claims of deceptive intent by the Plaintiffs.

e)    The Final Order's reliance on a guidance document issued by CDRH on March 12, 2020, is problematic, particularly as it was published after the pertinent events in the case had unfolded. The timing discrepancy raises concerns about the document's relevance to earlier incidents, indicating a potential misuse of regulatory guidelines.

f)    The Plaintiffs have presented evidence disputing CDRH's claim, that their in-house reviewers rarely advise 510(k) applicants to withdraw their 510(k) submissions. This evidence suggests that such recommendations occur more frequently than CDRH admits in their Notice Memo.

**Repercussions of Pishko's Professional Misconduct**

27.　　Pishko's demotion by CDRH from the role of Assistant Director of the Third-Party Review Program, to "Data Scientist" within the "Quality Management Staff", on August 16, 2021, represents a significant disciplinary response to his misconduct against the Plaintiffs. This change from a role managing a substantial budget and sizable team, signifies CDRH's serious approach to ethical breaches. The decision to demote Pishko not only supports the Plaintiffs' claims, but also demonstrates CDRH's dedication to maintaining high ethical standards. The prolonged vacancy of Pishko's former position, still unfilled as of February 25, 2023, according to CDRH's Management Directory, emphasizes the severity of his actions and their impact on the program.

28.　　CDRH's delay in appointing a successor to Pishko and the recent organizational re-structuring, including the dissolution of the 510(k) Third Party Review Program as a separate branch within the Division of Program Operations and Management, reflect the Agency's intent to prevent similar issues from occurring in the future. This reorganization, following Pishko's period of service, demonstrates the Agency's commitment to preserving the integrity of its operations.

**Impact of Pishko's Dismissal on CDRH's Final Order**

29.　　Pishko's removal as Assistant Director is pregnant with meaning, as it raises serious questions about his role in CDRH's decision-making process and the neutrality of the investigation against the Plaintiffs. The sequence of events, especially his removal occurring only three days after the issuance of the Final Order, suggests that Hinton may not have been aware of Pishko's impending demotion. This is further implied by Hinton's statement in the Order: "ADAS's allega-tions relating to Pishko provide no legitimate grounds for a hearing... ADAS has failed to present any genuine and substantial issues of fact in this matter." This statement indicates that Hinton might have been unaware of the actual extent of Pishko's misconduct.

30.　　The timing of Pishko's demotion suggests that key information may have been kept from Hinton by Pishko's superiors who would have known about the planned demotion, indicating a possible absence of good faith in the decision-making process. While CDRH might argue that linking Pishko's dismissal to the Final Order is a *Post Hoc Ergo Propter Hoc* fallacy, however, the close timing between these events warrants further investigation during discovery to ensure the integrity of CDRH's decision-making process, and to address the Plaintiffs' concerns about the fairness of the investigation against them.

31.    The decision of Pishko's superior to initiate his demotion on August 16, 2021, is significant in the context of judicial review under the APA, as it limits judicial review to the administrative record compiled during the proceedings before the relevant agency. As the Final Order in this matter was issued on August 13, 2021, the subsequent demotion of Pishko on August 16 would fall outside the established administrative record for this case. Consequently, this timing effectively excludes Pishko's demotion from consideration in the current judicial review, potentially shielding it from scrutiny by this Court.

**CDRH's Non-Compliance with Statutory Re-accreditation Deadline**

32.    The Plaintiffs contend that CDRH, specifically through Pishko, failed to adhere to the 60-day re-accreditation deadline as mandated by 21 U.S.C. § 360m(b)(2)(D)(ii), despite earlier assurances from Joseph Morkunas on September 10, 2020, who was a member of Pishko´s team. The Plaintiffs argue that this delay, attributed to COVID-19 related workload increases by Pishko in an email from November 9, 2020, was a deliberate strategy, as evidenced by the timely re-accreditation of all the other Accredited Persons during the same period.[2] Pishko´s email stated:

> "[t]his letter acknowledges that FDA has received your September 10, 2020 request for re-recognition. As you are aware, ADAS's current recognition is not scheduled to expire until August 19, 2021. FDA is managing an unprecedented workload due to the COVID-19 public health emergency. FDA is working to address the COVID-19 pandemic, as well as to keep other key mission-critical initiatives moving forward."

33.    The delay in getting re-accreditation, even though the Plaintiffs met all of the requirements for re-accreditation, harmed their reputation and deterred clients. Moreover, Pishko´s use of the pandemic as a pretext for the delay, instead of providing the real reason of waiting for Kobel´s declaration to be signed on February 27, 2021, raises concerns about Pishko violating 5 C.F.R. § 2635.101(b)(14), potentially eroding public trust in CDRH and FDA, especially amid global health crises. Only 18 days after Kobel´s declaration was signed, CDRH rejected the Plaintiffs´ re-accreditation application on March 17, 2021, which was 128 days past the mandated deadline.

---

[2] The most recent guidance from CDRH on the Third-Party Review Program, issued on March 12, 2020, stipulated that all Accredited Persons should submit applications for re-accreditation within a six-month window following the guidance´s issuance date.

**Pishko's Sexual Harassment and Misgendering during a Telephone Call with Reifschneider**

34.     During a February 19, 2020, telephone call involving Pishko and Reifschneider (who is Aguila´s wife), Pishko attempted to unduly influence Reifschneider regarding Cryptych's NuroChek 510(k) submission. Pishko also recommended that ADAS should voluntarily relinquish its Accredited Persons status. Pishko then began to ridicule the tonal quality of Reifschneider's voice as unduly masculine for a woman. This action not only disrespected Reifschneider´s gender identity, but also constituted a clear instance of misgendering, undermining her dignity and personal identity. Pishko´s conduct, which constitutes both sexual harassment and misgenderment, contravenes federal workplace policies and compromises the integrity of CDRH.

35.     On the same day, Reifschneider's articulated her complaint in an email to Pishko, and accused him of sexual harassment and misgendering. However, Pishko's email response on February 20, 2021, simply ignored the allegations of sexual harassment and misgendering, and discussed unrelated topics. Pishko's apparent omission in not sending Reifschneider's complaint about him to CDRH's Anti-Harassment Program, not only violates established protocols, but may also indicate an attempt to hide his own misconduct. This neglect of procedures and ethical norms substantiates allegations of Pishko's dereliction and implies an effort to shirk responsibility. Pishko's demotion on August 16, 2021, in the wake of these events, lends support to the accusations made by Reifschneider in her email from February 19, 2021. Further supporting this perspective, is the initiation of Pishko's investigation against the Plaintiffs immediately following Reifschneider's complaint, suggesting a retaliatory intent by Pishko. This temporal proximity raises serious questions about the motivation of Pishko's actions during his professional role at CDRH.

**Analyzing Misrepresentations in CDRH's Final Order**

36.     In the Final Order, CDRH's alteration of a statement from the Plaintiffs distorts its original meaning, presenting it negatively. The Order inaccurately quotes the Plaintiffs as advising Cryptych on February 5, 2020, "*the [CDRH] reviewer* believes that you should withdraw the current 510(k) [submission], and resolve the two problems before filing a new 510(k) [notification]." (emphasis added). However, the actual statement from ADAS was: "*the reviewer* believes that you should withdraw the current 510(k) application, and resolve the two problems before filing a new 510(k)." (emphasis added). By inserting "[CDRH]" before "reviewer," CDRH presents a misleading narrative, implying that ADAS tried to deceive Cryptych into wrongly believing that the advice

originated from a CDRH in-house reviewer, rather than an ADAS reviewer. This changes the statement's context and perceived authority, implying a misrepresentation of the reviewer's affiliation and justifying the revocation of the Plaintiffs' accreditation.

37.     The alteration of the Plaintiffs' communication in the Final Order undermines CDRH's perceived objectivity and fairness. Such misrepresentation in a key legal document not only compromises the accuracy and integrity essential in legal and regulatory proceedings but also risks misleading readers, such as Hinton, and unjustly skewing the perception of the Plaintiffs' actions.

38.     The deliberate alteration of the Plaintiffs' communication in CDRH's Final Order is not just an isolated incident of misrepresentation, but indicative of a broader pattern of procedural irregularities within CDRH. This raises serious concerns about the objectivity and integrity of the decision-making process in the Agency. Such actions suggest a systemic bias against the Plaintiffs, impugning the impartiality of CDRH's proceedings. The Plaintiffs argue that this pattern of behavior demonstrates a prejudicial stance by CDRH, leading to a decision that is not based on a fair and accurate assessment of facts, but rather on a skewed narrative. Consequently, CDRH's action in revoking the Plaintiffs' accreditation was not just marked by procedural errors, but also compromised by bias and an absence of due process, necessitating a comprehensive judicial examination of the entire process.

## CHALLENGING CDRH'S CLAIMS: THE CURIOUS CASE OF KONRAD KOBEL

### Challenging CDRH's Evidence against the Plaintiffs

39.     The central contention of CDRH against the Plaintiffs hinges on the assertion that ADAS purportedly employed a fictitious reviewer, identified as Kobel, and submitted documents containing fabricated attestations of his employment. Moreover, it is alleged that ADAS forged Kobel's signature on 31 review memoranda addressed to CDRH. This conduct, if proven, constitutes a breach of the integrity and ethical norms underpinning the 3P510k Review Program and represents a failure to adhere to the stipulations set forth in Section 523 of the FD&C Act.

40.     Kobel's declaration against the Plaintiffs plays a pivotal role in this case, as it was only after its signing on February 27, 2021, that CDRH deemed it had sufficient evidence to justify revoking the Plaintiffs' accreditation. Kobel´s declaration was procured by CDRH through a series of communications between Pishko and Kobel, spanning from March 11, 2020 — only 21 days following Reifschneider's complaint — until February 27, 2021.

41.    Contrary to the Final Order's assertion that "there is no genuine and substantial issue of fact with respect to whether ADAS submitted documents containing misrepresentations regarding Kobel's employment with ADAS, including forged signatures on 31 submissions to CDRH," there indeed exist numerous important factual issues warranting consideration. Hinton's statement overlooks the complex aspects related to Kobel's service with ADAS, and the alleged authenticity of the signature on Kobel's declaration, necessitating a thorough examination of the evidence.

42.    In his declaration, Kobel explicitly states, "I have never met or communicated with anyone employed by or otherwise associated with ADAS." Yet, this assertion is directly challenged by evidence indicating that Kobel, alongside his colleague Winterhalter, interviewed Aguila for a position at Aesculap AG in Germany on March 28, 2013. This conflicting information diminishes the credibility of Kobel's declaration.

43.    Kobel's credibility suffers further due to a "Warning Letter" from CDRH dated September 26, 2011. This letter accused him of misbranding of brain "aneurysm clips", while he was at Aesculap AG, a violation of 21 U.S.C. § 352(t)(2). This misbranding incident resulted in patient injuries, accentuating the severity of the violation. Furthermore, Kobel's omission in reporting these injuries to CDRH, a requirement under 21 C.F.R. § 803.17, amplifies concerns regarding his ethical conduct. The Warning Letter from CDRH explicitly stated that such infractions could result in criminal prosecution under the FD&C Act, highlighting the seriousness of Kobel's misdeeds. This misconduct not only reflects professional irresponsibility but also undercuts Kobel's ethical integrity. This situation raises questions about his trustworthiness and reliability as a witness, undermining his overall credibility. Moreover, the prior incident of misbranding implicates the possibility of coercion or undue influence by Pishko over Kobel. The apprehension of facing potential punishment from CDRH for his earlier infraction could have influenced Kobel to conform to Pishko's narrative in his declaration, thereby questioning the legitimacy of his declaration.

44.    In their Notice, CDRH claims that "Mr. Kobel confirmed that he … had signed and *submitted that firm's 510(k) submission K032059*." (emphasis added). However, an examination of Kobel's declaration reveals a stark contradiction to CDRH's claim, as it lacks any acknowledgment from Kobel regarding his alleged participation in the signing or submitting the 510(k) submission for K032059. Instead, Kobel merely acknowledges his signature on "Exhibit 2," yet he does not specify or describe the nature of the document encompassed within "Exhibit 2."

45.     The credibility of CDRH's claim that Kobel "signed and submitted that firm's 510(k) submission K032059" is further called into question by information available in CDRH's own 510(k) database. This database, which catalogs all medical devices cleared by CDRH, mandates the inclusion of the applicant's contact person for each 510(k) clearance. For the Aesculap 510(k) submission referenced as K032059, the listed submitter is Georg Keller, not Kobel as CDRH claims. This inconsistency holds substantial weight, considering that if Kobel had indeed been the person responsible for signing and submitting the 510(k) submission for K032059, logic dictates that it would be his name, rather than Keller's, listed as the submitter in CDRH's 510(k) database. This detail weakens the credibility of CDRH's allegation about Kobel's involvement in this specific 510(k) submission.

46.     The credibility of CDRH's claim that Kobel clearly remembers his specific involvement with the 510(k) submission K032059 is highly questionable. Given Kobel's long tenure at Aesculap AG from 1994 to 2016, a period during which the company filed 249 separate 510(k) submissions, as documented in CDRH's public 510(k) database, it seems improbable that he would distinctly recall signing a specific submission from this extensive collection of 510(k) submissions. This is particularly true for the K032059 submission, dated July 2, 2003, which was just the 43rd submission in the long list of 510(k) submissions at Aesculap, during Kobel's long career. Such a precise recollection of a single 510(k) submission amidst hundreds of submissions, seems unlikely. This undermines the validity of CDRH's assertion regarding Kobel's detailed recollection of this specific 510(k) submission. The implausibility is further highlighted when considering Kobel's failure to recall interviewing Aguila in 2013, an event much closer in time than a 510(k) submission from 2003, thereby undermining the consistency and reliability of Kobel´s recollections.

47.     CDRH's Notice Memo included a significant statement: "CDRH located the *K032059 submission submitted by Konrad Kobel*; below is an image of Konrad Kobel's signature from that document." (emphasis added). However, CDRH seemed to be unaware that this statement directly contradicts the Kobel declaration, where Kobel supposedly wrote that his "regulatory affairs department *did not submit 510(k)s*, its North American subsidiary did". (emphasis added). Consequently, Kobel could not have "submitted" the K032059 510(k) submission, as stated by CDRH in its Notice Memo, which compromises the credibility of CDRH's depiction of his involvement.

48.     The presentation by CDRH of what they allege to be Kobel's signature on the K032059 submission, seems designed to question the authenticity of Kobel's signatures on the ADAS review

memoranda, thereby challenging the integrity of the ADAS's review process. However, Kobel's declaration, affirming his non-involvement in 510(k) submissions for Aesculap, contradicts CDRH's assertion. Furthermore, the operational reality that Aesculap's 510(k) submissions were managed by their Pennsylvania subsidiary, when combined with the fact of Kobel's location in Germany, makes his personal signing of the K032059 submission improbable.

49.    Uncovering that the K032059 submission was actually sent by Keller, starkly contrasting with CDRH's claim that Kobel was the one who submitted it, raises substantial doubts about the genuineness of the signature on the 510(k) submission that CDRH attributes to Kobel. This information directly challenges Kobel's declaration statement, "I have never authorized anyone else to use my name or signature on FDA submissions".[3] Given that Keller, located in Pennsylvania, was responsible for the submission of K032059, the appearance of Kobel's alleged signature on the submission becomes increasingly problematic, particularly as Kobel is based in Germany, not Pennsylvania.

50.    Attached to CDRH's Notice, there is an exhibit that is labeled as "Ref. 8b", that is a purported copy of a communications between Kobel and Pishko. Ref. 8b includes a notable statement attributed to Kobel: "I have signed documents which should be available at FDA to proof [sic] my signature." Despite this assertion, CDRH has only presented one document, K032059, as evidence of Kobel's supposed signature. This singular presentation raises questions about the comprehensiveness of CDRH's evidence. The lack of additional documents signed by Kobel, which he claims are available at FDA, suggests a potential gap in CDRH's documentation. The selective application of evidence by CDRH, especially given the reported availability of additional Kobel signatures within the Agency's records, calls into question the comprehensive nature of CDRH's investigative process.

### Inconsistencies in Kobel's Signature: A Detailed Examination

51.    CDRH's Notice posits another crucial claim: "Mr. Kobel's actual signature bears no resemblance to the Konrad Kobel signature submitted by ADAS." This statement is central to their argument, suggesting that Kobel was not genuinely associated with ADAS. However, a meticulous comparison of the signatures presented by CDRH – one from Kobel's declaration dated February

---

[3] It is crucial to emphasize that Kobel's declaration asserts his non-consent for others to use his signature on "FDA submissions," but it omits any reference to Third-Party Review memoranda.

27, 2021, and the other from Aesculap's 510(k) submission K032059 – reveals notable inconsistencies, calling into question CDRH's conclusion. Specifically, the signature in Kobel's declaration is missing the central loop characteristic of the signature in the Aesculap 510(k) document. Additionally, in the Aesculap signature, the letter "o" remains unclosed, contrasting sharply with the crossed "o" in the declaration's signature. Furthermore, the "u" shape visible in the Aesculap signature is markedly different in the declaration's signature. The "l" in the Aesculap signature is upright, unlike the slanted and shortened version in the declaration. These distinct differences in loop formation, letter closure, and the angle of the strokes undermine CDRH's claim that both signatures belong to the same Kobel.

52.     It is perplexing why CDRH did not consult a signature expert to determine if these were signatures of the same person. The absence of forensic handwriting analysis to validate CDRH's claim raises serious questions about their assertion that the signatures on both the Aesculap 510(k) submission and Kobel's declaration were made by the same individual. This lack of verification not only weakens CDRH's position, but also hints at a possible gap in their investigative diligence.

53.     Given that the Aesculap 510(k) document was reportedly attached to Kobel's declaration as an exhibit, there exists the possibility that the signatory of the declaration might have tried to mimic the signature from the Aesculap 510(k) document. In a thorough and impartial investigation, standard procedure would dictate that the individual, believed to be Kobel, should have been asked by CDRH to provide a new signature, without being exposed to the existing one on the Aesculap 510(k) document. Such a step would have ensured an authentic sample of Kobel's signature, free from potential imitation or influence. The neglect in this facet of the investigation induces skepticism about the methodological rigor and objectivity exercised by Pishko, who led the investigation, particularly regarding the validation of essential evidence. Additionally, CDRH ought to have requested that Kobel provide copies of his passport, driver's license, or other official documents bearing his signature.

**The Role and Importance of Notarization in the Authentication of Disputed Documents**

54.     In the Final Order, Hinton declares that "[w]hether the declaration is notarized is not dispositive." Additionally, CDRH's Opposition downplays the importance of notarizing Kobel's declaration. They maintain that the absence of notarization does not compromise its validity, asserting:

> "ADAS attempts to diminish the value of the Konrad Kobel declaration submitted by CDRH on the ground that it was not notarized (ADAS Req. at 7), but there is no requirement in the FD&C Act, its implementing regulations, or the regulations governing an administrative proceeding that such documents be notarized."

55.    However, this position overlooks the imperative role of notarization in authenticating documents, particularly when the identity of the declarant is key and has not been verified through direct interaction. Central to CDRH's argument, Kobel's declaration contains alleged exhibits like a copy of Aesculap's 510(k) submission and what is claimed to be Kobel's postulated CV. These documents, lacking independent authentication, serve as the primary evidence against the Plaintiffs in the Final Order pertaining to the Kobel matter. The declaration's credibility is further questioned due to inaccuracies in the CV (e.g., "Januar [sic] 2006"),[4] and omission of details like the 2011 CDRH Warning Letter to Kobel.

56.    Furthermore, the uncertainty regarding the identity of CDRH employee who retrieved the crucial Aesculap K032059 submission from CDRH archives, along with the lack of any affidavits or declarations from CDRH employees, including those engaged in the investigation like Pishko, raises questions about the integrity of the evidence and the investigative process. The absence of notarization, and CDRH's failure to directly verify Kobel's identity, substantially weaken the probative value of this declaration. This oversight is in direct conflict with the principles of evidentiary rules, established in Federal Rule of Evidence 901(a), which mandates adequate authentication of documents. The significance of this shortcoming is amplified in this context, where Kobel's declaration plays a pivotal role. This suggests that CDRH overlooked the stringent legal criteria for document authenticity in federal and administrative proceedings, an essential factor in situations where the trustworthiness of a declaration, is important to resolving the dispute.

**Break in Chain of Custody for Aesculap's K032059 Document: Legal Implications**

57.    The lack of a documented chain of custody for the K032059 submission, claimed to be located by CDRH, and reportedly directly submitted by Kobel in July 2003, presents serious legal

---

[4] Common practice dictates that curriculum vitae (CVs) should be meticulously checked for spelling and grammatical errors due to their professional importance. The noticeable misspelling of "Januar 2006" in Kobel's alleged CV is atypical and detracts from the document's credibility, casting doubt on both the authenticity of the CV and the reliability of the evidence in this case.

implications. An unbroken chain of custody is crucial in legal contexts, as it authenticates and preserves the integrity of evidence. Considering that CDRH receives approximately 5,000 new 510(k) submissions each year, identifying a single submission from an archive of nearly 87,000 510(k) files since July 2003, is a daunting task. The lack of comprehensive records detailing the discovery and subsequent handling of the K032059 submission casts doubts on both its authenticity and the manner in which CDRH has processed this evidence. Notably, the K032059 submission was a physical paper file, requiring a manual search in CDRH's extensive archives, as opposed to a more easily searchable electronic file. Additionally, the potential involvement of Pishko in locating this submission calls for a thorough examination of his role, potential bias, and conflict of interest in the case, as his direct involvement in retrieving this crucial document might impact the case's integrity.

**Examining ADAS's Lack of Motive to Misrepresent Kobel's Role**

58.     The Plaintiffs lacked any reason to falsely present Kobel as an ADAS reviewer, especially since having a second reviewer was only optional, not a CDRH requirement. This is clearly demonstrated by Aguila's solo completion of a Third Party review that CDRH officially accepted on July 28, 2021 (i.e., 510(k) number: K212339). Furthermore, Aguila's competence in conducting 510(k) reviews has been recognized for its quality, as evidenced by Pishko's commendation on June 19, 2019, where he acknowledged ADAS's 510(k) reviews as being on par with CDRH's in-house reviewers, stating: "[n]ice job at achieving FDA-equivalent reviews in your most recent submissions." CDRH's accpetance of Aguila's independent review of K212339 affirms that the Plaintiffs complied with CDRH guidelines by relying exclusively on Aguila as the sole reviewer for that 510(k) submission, thus showing that there was no need for Kobel's involvement as a secondary reviewer. It should be noted that Aguila underwent FDA-reviewer training, when ADAS first received its accreditation in 2018. This information further dispels any notion of deceptive practices by ADAS regarding Kobel's involvement, as well as any intent to deceive by ADAS.

59.     In their request to CDRH dated March 26, 2021, the Plaintiffs presented a reasoned argument: if Kobel's signature was indeed forged by ADAS, implying he never legitimately reviewed for ADAS, then it would logically engender disbelief on the validity of all the 510(k) clearances that were based on ADAS's review memos and recommendations. Under these circumstances, a diligent and consistent response from CDRH would be to undertake a comprehensive

review of these clearances, possibly even rescinding them, to maintain regulatory compliance. However, CDRH's lack of action in reevaluating these clearances can be seen as a tacit admission that Kobel's role as a reviewer for ADAS was legitimate. Consequently, the lack of action by CDRH to address this issue raises questions about the credibility of their allegations concerning the supposed forgery of Kobel's signature, indicating a potential lack of conviction in the forgery claim.

**Bias in CDRH's Investigation of Kobel's Involvement**

60.    CDRH's active role in formulating and writing Kobel's declaration represents a serious violation of the principle of witness independence, which is crucial for maintaining the integrity of legal proceedings. This involvement suggests an inappropriate manipulation of evidence and a clear deviation from the ethical standards expected of federal agencies. These standards are put in place to guarantee impartiality and explicitly forbid any influence on witness testimony. Pishko's vested interest in the outcome of this case creates a conflict of interest, potentially breaching legal and regulatory guidelines related to witness testimonies and federal employee conduct. The sophistication of the English-language legal terminology used in Kobel's declaration sharply contrasts with his demonstrated limited proficiency in English, as evidenced by errors in his e-mails with Pishko, such as "[d]ear Mr. Herr [sic] Pishko" or "I'm not sure why the mails [sic] to you are aleays beeing [sic] returned".[5] This discrepancy raises serious questions about the authenticity of Kobel's declaration. These concerns are further amplified by the inappropriate involvement of CDRH in the declaration's drafting, a clear violation of the expected impartiality of the Agency.

61.    The revelation of covert interactions between Pishko and Kobel, spanning March 11, 2020, to February 27, 2021, only became public following CDRH's Notice on March 12, 2021. The belated admission of their extended, and previously undisclosed, collaboration devalues the perceived ethical integrity and transparency of Pishko's conduct. The Plaintiffs, unaware of these interactions until CDRH's official notification on March 12, 2021, may rightfully question the genuineness of Pishko's investigative methods. Moreover, Pishko's exclusive focus on Kobel, to the exclusion of all other ADAS reviewers, such as Aguila, indicates a possible prejudicial intent.

---

[5] The consistent bouncing back of Kobel's emails to Pishko, implies that Pishko may have been intentionally blocking them, possibly to force telephonic communication. This could suggest Pishko's intent to reduce written records of their interactions, potentially obscuring their content or nature.

The approach Pishko took in investigating ADAS raises serious questions about fairness. By focusing exclusively on ADAS, and ignoring the reviewers of other 3PROs, Pishko showed a clear bias. This pattern of selective attention undermines the fairness of the investigation, and contravenes the standards mandated by the APA, which requires that every entity receive impartial treatment. The evident departure from this fundamental principle of fairness in the treatment of the Plaintiffs, not only raises questions about the integrity of the investigation but also potentially represents a violation of the Plaintiffs' legal rights under the APA. The apparent disparity in Pishko's investigative approach triggers doubts of potential bias, culminating in conclusions that may be deemed inequitable and prejudiced.

62.    By the time Pishko initiated contact with Kobel on March 11, 2020, Kobel was no longer working for Aesculap AG for several years and was contending with the challenges of early onset dementia. In spite of these factors, the Plaintiffs, swayed by Aguila's prior association with Kobel, involved him in a limited number of review tasks for ADAS. However, it is important to note that Aguila was responsible for the vast majority of ADAS's Third-Party Review work. But the continuous pressure from Pishko over 11 months, raises the likelihood that Kobel's apparent signing of the declaration on February 27, 2021, was made under duress. The persistent influence exerted by Pishko brings into question the voluntary nature and validity of the declaration. Kobel's declaration was a pivotal component, serving as the crucial missing link, that enabled CDRH to commence the accreditation revocation process against the Plaintiffs on March 12, 2021.

63.    The initiation of Pishko's investigation into Kobel on March 11, 2020, is dubious due to the lack of probable cause. This skepticism stems from the absence of complaints or signs of misconduct involving Kobel, as well as a lack of accusations against ADAS for using fictitious reviewers. This lack of preliminary evidence typically required for initiating such an investigation raises serious doubts about the investigation's procedural validity. The absence of a valid basis for starting an investigation suggests that Pishko's outreach to Kobel might have been a cynical move, potentially intended to divert focus from the sexual harassment and misgendering accusations brought against Pishko by Reifschneider. By creating an inquiry on ADAS, Pishko could potentially protect his position within CDRH and undermine ADAS's credibility. This scenario fits into a pattern where Pishko appears to have used his role for personal advantage, thereby compromising the fairness and impartiality of CDRH.

64.     One illustrative example of the improper conduct is Pishko's invocation of COVID-19 as a justification for not adhering to the 60-day deadline mandated for processing the Plaintiffs' re-accreditation application. This rationale appears to be a pretext, ostensibly concealing Pishko's intentional delay of the decision until after the receipt of Kobel's declaration. Such actions by Pishko indicate a deliberate manipulation of the 60-day deadline for ulterior motives, thereby undermining the fairness and integrity of the process. Furthermore, the prolonged and targeted pressure applied to Kobel, especially considering his early onset dementia, reinforces the perception of Pishko's actions as ethically questionable and strategically driven. The initiation of Pishko's investigation without probable cause erodes the integrity and legitimacy of the inquiry on the Plaintiffs. This lack of a justifiable basis for the investigation invites suspicion regarding potential personal motivations, particularly in light of the allegations made by Reifschneider against Pishko for sexual harassment and misgenderment right before Pishko´s investigation started.

## CRYPTYCH: QUESTIONING CDRH'S RELIANCE ON A DUBIOUS SOURCE

### Cryptych's Unauthorized Audio Recording of the February 13, 2020 CDRH Teleconference

65.     The Plaintiffs conducted a review of a 510(k) submission for Cryptych, an Australian company, regarding their electroencephalogram (EEG) device, called the "NuroChek". On March 18, 2020, the Plaintiffs sent their recommendation to CDRH, leading to the NuroChek´s clearance on April 23, 2020, under 510(k) number K200705. In the Final Order, Hinton alleges that the Plaintiffs deceived Cryptych regarding the identity of the reviewer for NuroChek's 510(k) submission. However, this claim is weakened by the vagueness in CDRH's narrative about when Cryptych supposedly became confused about the reviewer's identity. Hinton fails to pinpoint the time when Cryptych believed CDRH was handling their 510(k) review or when they were certain that the Plaintiffs were the reviewers. Additionally, this accusation is inconsistent with the Plaintiffs' prior communication to Cryptych on February 5, 2020, advising them to withdraw their 510(k) submission due to unresolved safety issues with NuroChek.

66.     The Plaintiffs' suggestion for Cryptych to withdraw their NuroChek 510(k) submission included an offer to reassess their revised 510(k) submission at no cost in the future, contingent on Cryptych addressing the NuroChek device's safety issues. As a Third Party Review Organization, ADAS, under 21 U.S.C. § 360m(b)(5), can independently determine its fees for 510(k) reviews. Once clients engage a 3PRO like ADAS, they are not subject to additional 510(k)-related fees,

including those typically required by CDRH. This financial advantage is one of the main reasons medical device manufacturers often prefer having their 510(k) submissions reviewed by a 3PRO, which generally charges less than CDRH. In contrast, when CDRH conducts a review, as mandated by 21 U.S.C. § 379j(a)(2)(A)(viii), it is legally obliged to impose uniform fees on all 510(k) applicants. Therefore, it appears highly unlikely and without logical basis for Cryptych to assume that a CDRH in-house reviewer would propose to review their future 510(k) submission free of charge.

67.    On February 6, 2020, the day after the Plaintiffs advised Cryptych to withdraw their NuroChek 510(k) submission, Cryptych's consultant, Allison Komiyama, directly contacted CDRH with allegations that the Plaintiffs misled Cryptych into believing CDRH was conducting the review. This claim surfaced despite Cryptych not asking the Plaintiffs about who was reviewing their submission until a February 13, 2020, teleconference. By then, Cryptych was already informed that the Plaintiffs, not CDRH, were responsible for the review. This understanding contradicts any claims of deception against the Plaintiffs. Further evidence of Cryptych's lack of belief in being misled is found in the response of Cryptych's owner, Greg Roger. Immediately following the teleconference on February 13, 2020, Roger sent an email expressing gratitude towards the Plaintiffs, a response that appears unlikely had Cryptych felt misled by them. Moreover, Cryptych's decision to continue working with the Plaintiffs as their Third-Party Review Organization, without seeking an alternative provider, suggests their satisfaction and trust in the Plaintiffs' services. This contradicts the notion of any real misunderstanding by Cryptych regarding the review process.

68.    Following the clearance of the NuroChek device, the Plaintiffs uncovered concerning information about Cryptych's marketing strategies and safety study methodologies, which were not disclosed during the 510(k) review process. Cryptych was promoting NuroChek as a concussion diagnostic tool, a use not evaluated in their 510(k) submission or included in the device's official intended use. Further, an integral safety study published over a year after the 510(k) clearance, on April 27, 2021, by both Cryptych and Headsafe, excluded individuals with "dreadlocks" from the safety study, citing an adverse impact on the NuroChek's accuracy – an issue previously undisclosed to the Plaintiffs. Aguila, recognizing the severity of the situation, promptly reported these findings to CDRH.

69.    Due to the incomplete and misleading information presented by Cryptych during the 510(k) review process for NuroChek device, Aguila strongly recommended to CDRH that they

should consider withdrawing the NuroChek's 510(k) clearance. This suggestion was predicated on the significant safety concerns that surfaced after the 510(k) clearance was granted, concerns that were neither apparent, nor disclosed to the Plaintiffs during the review period. Aguila stated that had he been aware of the undisclosed risks at the time, then he would not have endorsed the NuroChek's 510(k) clearance on March 18, 2020. It is reasonably speculated that CDRH's reluctance to rescind NuroChek's 510(k) clearance (i.e., "rescission") may be motivated by a concern that such a step could bolster the Plaintiffs' case. This apprehension likely stems from the possibility that rescinding the 510(k) clearance might be perceived as an acknowledgment of a mistake in CDRH's earlier decision to revoke the Plaintiffs' accreditation.

70.    Aguila, who is of partial Afro-Cuban descent, faced personal distress upon learning that he had inadvertently recommended a device that was flawed in assessing African-Americans with dreadlocked hair. This concern arose from the NuroChek's revealed limitation in accurately diagnosing individuals with dreadlocks, posing a risk of misdiagnosis. The seriousness of this issue is heightened by Cryptych promoting NuroChek as a concussion diagnostic tool. This off-label marketing could cause African-American athletes to mistakenly think they are concussion-free, leading to potential misdiagnoses and health risks.[6] This misdiagnosis would present a serious health hazard. Aguila's ties to a community affected by this undisclosed risk intensified his concern.

71.    Importantly, on January 6, 2022, the Plaintiffs were informed by Cryptych's attorneys that Cryptych had illicitly recorded the teleconference on February 13, 2020. This meeting, held using CDRH's telecommunication system and involving CDRH and the Plaintiffs, fell under the privacy laws of Maryland and Florida, which mandate all-party consent for recording communications. Cryptych's unauthorized recording not only breaches these legal standards but also severely damages its credibility. Transparency and honesty are fundamental in discussions among CDRH, medical device manufacturers, and Third-Party Review Organizations. Such unauthorized recording undermines the necessary openness and trust in these dialogues, potentially causing participants to be wary and less candid due to fears of unsanctioned disclosure of their private conversations.

---

[6] Cryptych's marketing of NuroChek as a concussion diagnostic tool for NCAA and NFL players, many of whom have dreadlocked hair, is problematic because it is an off-label use. NuroChek's safety studies excluded individuals with dreadlocks, a fact not disclosed in their user manual or marketing materials. This omission raises serious ethical concerns about NuroChek's reliability and safety as an off-label concussion diagnostic tool.

72.    In the Final Order, Hinton delineated the reasons for the swift revocation of the Plaintiffs' accreditation and the denial of any hearings. The second reason for this decision rested on Cryptych's assertions that they were misled by the Plaintiffs, regarding who was conducting the review of their 510(k) submission. Hinton stated:

> "*[w]hether ADAS's conduct in misleading Cryptych concerning the status of its submission was deliberate is immaterial* to whether the uncontested facts related to these communications show that ADAS was substantially not in compliance with the requirements of section 523 of the FD&C Act and failed to act in a manner that is consistent with the purposes of section 523. Based upon the emails forwarded to FDA, *Cryptych was in fact misled about the status of its 510(k) submission*. Additionally, even if ADAS did not intend to mislead ADAS, ADAS failed to meet the basic requirements of professional business standards by *not ensuring that their client understood something as simple as whether its 510(k) submission was being reviewed by ADAS or FDA.* ... As a result, I find that ADAS has not raised any genuine and substantial issues of fact that would merit a hearing relating to the Cryptych allegations; therefore, *I deny ADAS a hearing on these allegations.*" (emphasis added).[7]

73.    Hinton's statement in the Final Order that "[w]hether ADAS's conduct in misleading Cryptych concerning the status of its submission was deliberate is immaterial" overlooks a fundamental legal principle: the significance of intent in determining liability and appropriate sanctions. Contrary to Hinton's assertion, discerning whether ADAS's actions regarding Cryptych were deliberate or unintentional is vital. Intentional misinformation could lead to serious legal consequences, such as allegations of fraud or misrepresentation, which typically demand severe sanctions. On the other hand, unintentional errors, likely stemming from miscommunication or oversight, may call for corrective rather than punitive measures. Ignoring the intent in ADAS's conduct not only contravenes the tenets of legal responsibility and the proportionality of sanctions, but also strays from established legal precedents. Such an oversight results in unfair and disproportionate outcomes. Recognizing the intent behind actions is therefore paramount to ensure fairness, consistency, and justice in the legal process, especially in cases governed by the intricate regulatory frameworks of the FD&C Act.

---

[7] According to the 2004 and 2020 CDRH guidance documents on Third-Party Reviews, reviewers are not required to update 510(k) applicants on their submission status, including the clearance by CDRH. Applicants are responsible for monitoring their submission's status, including checking CDRH's public 510(k) database for their device's listing post-clearance.

74.     The decision of CDRH to consider Cryptych as a trusted witness in the proceedings against the Plaintiffs seems untenable. This assessment is based on a confluence of problematic behaviors exhibited by Cryptych. Firstly, their marketing practices have been consistently questionable, raising doubts about their reliability and integrity. Secondly, the deliberate omission of critical safety data in their disclosures not only misleads, but also potentially jeopardizes public health. Lastly, their breach of privacy laws, exemplified by the unauthorized recording of a CDRH teleconference, directly contravenes legal standards and ethical business practices. These collective actions by Cryptych erode the credibility of any testimony they might provide. CDRH's reliance on information provided by Cryptych to substantiate claims against the Plaintiffs appears compromised.

**Challenging CDRH's Interpretation: FDA's Inclusive Use of "FDA Reviewers" for Third Party Reviewers**

75.     In CDRH's Opposition document from April 15, 2021, they write: "ADAS contends that its misrepresentations to its client were simply a misunderstanding, because ADAS allegedly routinely refers to its reviewers as `*FDA reviewers*´ and ADAS' client did not realize that." (emphasis added).[8] In this context, CDRH appears to narrowly define "FDA reviewer" as exclusively denoting reviewers employed directly by FDA or CDRH, in an in-house capacity. Consequently, according to CDRH's viewpoint, any instance where the Plaintiffs used the term "FDA reviewers", is perceived as a blatant attempt by the Plaintiffs to mislead Cryptych. CDRH suggests that the Plaintiffs gave Cryptych the misleading impression that Cryptych was directly communicating with reviewers employed by CDRH itself, rather than clearly indicating that the reviewers were actually part of the Plaintiffs' own Third-Party review team.

76.     Contradicting CDRH's narrow interpretation, FDA itself has historically used the term "FDA reviewers" in a broader sense, encompassing reviewers from 510(k) Third-Party Review Organizations like ADAS. Evidence of this broader application is found in an official FDA press announcement dated November 15, 2017, titled "FDA unveils a streamlined path for the authorization of tumor profiling tests alongside its latest product action." In this announcement, FDA explicitly includes Third-Party reviewers under the umbrella of "FDA reviewers," indicating a more expansive interpretation of the term. The announcement states:

---

[8] CDRH's assertion that ADAS has previously confessed to misrepresenting its clients is not true.

"[o]ther accredited, ***third-party FDA reviewers*** also may become eligible to conduct such reviews and make clearance recommendations to the agency." (emphasis added). [9]

77.    FDA´s practice of using various names for Third-Party reviewers is not isolated. For instance, FDA's June 2000 guidance titled "Implementation of Third Party Programs Under Modernization Act of 1997", employs the term "510(k) reviewers" when discussing the necessary qualifications for personnel in Third-Party Review Organizations. This example further illustrates FDA's flexible approach to terminology, highlighting a broader trend of using diverse labels for reviewers associated with Third-Party Review Organizations.

78.    Consistent with industry norms, the Plaintiffs utilize various terms to designate their reviewers, including "FDA reviewer," "510(k) reviewer," "ADAS reviewer," "Third-Party reviewer," and simply "reviewer." This terminological variety aligns with customary practices in the regulatory field, rather than any intent to deceive. Such variety in descriptions is a recognized norm in the field, underscoring the flexibility in language usage within regulatory contexts. Notably, there is not a universally adopted official term for reviewers affiliated with Third Party Review Organizations, aside from the term "Accredited Persons." However, this term is mostly used in formal FDA guidance documents, and is not commonly employed in everyday language within the industry.

79.    Consequently, a variety of informal labels have emerged. For instance, CDRH's "3P Early Interaction Work Instruction" document, dated July 9, 2018, frequently employs terms such as "3P reviewer" or "3PRO reviewer" when referring to Third-Party reviewers. This practice underscores the flexible and varied use of terminology within the context of the Third-Party Review Program. Notably, this document draws an instructive analogy:

> "engagement between FDA and 3PROs should be similar to those between a new ***FDA reviewer*** and mentor." (emphasis added).

80.    In CDRH's metaphor, FDA is portrayed as an experienced "mentor," guiding a "new FDA reviewer," symbolizing the Third-Party Review Organization ("3PRO"). This comparison

---

[9] FDA press releases undergo thorough review and vetting, ensuring accuracy in public communications. Given this high level of scrutiny, the use of specific terms like "third-party FDA reviewers" is unlikely to be inadvertent, but a deliberate choice for a sensitive, public-facing document.

suggests a strong parallel between "Third-Party reviewers" and "FDA reviewers," implying that they are virtually synonymous, serving similar roles. The metaphor indicates that within CDRH's regulatory framework, "Third-Party reviewers" and "FDA reviewers" are perceived as fulfilling equivalent functions, akin to two sides of the same coin.

81.    The absence of a standardized, official terminology for describing reviewers in the industry leads to potential ambiguity around the term "FDA reviewer." The context surrounding the emails to Cryptych, suggests that the Plaintiffs' use of that term aligned with industry norms. Importantly, FDA has not explicitly prohibited "Third-Party reviewers" from using the designation "FDA reviewer." An examination of communications from other Third-Party Review Organizations during discovery, would likely reveal similar usage of the term "FDA reviewer" to denote their own reviewers in communications with clients. This widespread practice among Third-Party Review Organizations reinforces the notion that the term "FDA reviewer" is used in a broader, industry-accepted sense, rather than being exclusive to in-house CDRH personnel, as is claimed in CDRH's Opposition.

82.    If confusion about the identity of the reviewer existed at Cryptych before March 18, 2020, it was Cryptych's responsibility to seek explicit clarification from the Plaintiffs. Instead, Cryptych escalated the issue to CDRH, possibly aiming to cast aspersions on the Plaintiffs' professional conduct. It is impractical for the Plaintiffs to proactively address misunderstandings that Cryptych had not openly communicated, as the Plaintiffs are not equipped with the ability to read minds or anticipate unvoiced concerns. Given Cryptych's extensive experience in regulatory submissions and their engagement with consultants like Komiyama, they should have proactively clarified any ambiguities with the Plaintiffs, especially regarding the reviewing entity's identity.

83.    It seems plausible that Cryptych's complaints to CDRH about the Plaintiffs were driven more by resentment than genuine concerns. This is inferred from Cryptych's evident irritation with the Plaintiffs' comprehensive safety inquiries about the NuroChek device, which may have been perceived by Cryptych as delaying the clearance process. Cryptych's adverse reactions to these safety issues disrupted effective communication between the two parties. This antagonistic attitude was especially clear during a phone call on February 7, 2020, where Cryptych negatively received the Plaintiffs' advice for further safety tests on the NuroChek device. After this call, Cryptych recognized their misconduct and sent an email to the Plaintiffs apologizing for their unprofessional and offensive language during the call.

84.     It is imperative to emphasize that the Plaintiffs lacked any discernible motive to falsely represent themselves as being CDRH in-house reviewers in their interactions with Cryptych. Engaging in such a misrepresentation would not yield any practical advantages for ADAS or its reviewers. This absence of any apparent incentive fundamentally challenges the plausibility of the alleged misrepresentations by the Plaintiffs.

**The Impact of the Additional Information Request on the Accreditation Revocation**

85.     The Final Order emphasizes a crucial allegation that the Plaintiffs misled Cryptych into believing an "Additional Information Request" issued on August 6, 2019, came from CDRH. This accusation influenced Hinton's decision to revoke the Plaintiffs' accreditation, as clearly stated in the Order:

> "CDRH found specifically, based on its review of emails: [o]n August 7, 2019, [sic] ADAS conveyed to Cryptych what it claimed was an additional information request from CDRH…".[10]

86.     The statement in the Final Order is readily refutable. After receiving Cryptych's original NuroChek 510(k) submission on July 26, 2019, the Plaintiffs conducted a thorough evaluation, aligning with standard Third-Party Review Organization practices. This led them to identify 19 major safety deficiencies in the NuroChek submission on August 6, 2019, which were detailed in an "Additional Information Request" document. This process, typical among Third-Party Review Organizations, is initiated when they ascertain that a 510(k) submission is incomplete and necessitates further information for a substantial equivalence determination, in line with CDRH guidelines. As per CDRH's 2004 guidance: "[i]f you identify any deficiencies in the submission, you will need to contact the 510(k) submitter".[11] This ensures transparent communication and addresses issues while upholding the integrity and rigor of regulatory reviews.

---

[10] Due to the time difference between Sydney, Australia (Cryptych's base) and Miami, Florida (ADAS's location), emails from Cryptych often show dates a day ahead of U.S. Eastern time. For example, the Additional Information Request ("AIR") sent by ADAS on August 6, 2020, would be dated August 7, 2020, in Australia. This time zone factor is vital for correctly interpreting the communication timeline between the Plaintiffs and Cryptych.

[11] It is important to note that, as of August 6, 2019, the prevailing guidance document governing Third Party Reviews was CDRH's 2004 guidance. This document provided the framework and protocols for the 510(k) Third-Party Review process at that time.

87.    Despite the clear display of ADAS's name at the top of the Additional Information Request document, Cryptych purportedly misconstrued it as coming from CDRH. This misunderstanding is particularly puzzling considering the explicit statement by the Plaintiffs in the document: "[t]he Third Party Review [sic] has reviewed your 510(k) submission and has determined that additional information is required." Even though the Plaintiffs inadvertently omitted the word "Organization" in the phrase, the language distinctly points to "the Third Party Review" as the originator of the request, not CDRH, making Cryptych's alleged confusion about its source quite baffling.

88.    In their Notice Memo, to substantiate the accusation that the Plaintiffs misrepresented the Additional Information Request to Cryptych as emanating from CDRH, an email exchange between the Plaintiffs and Cryptych was referenced as evidence, marked as "[r]ef. 2 at 3":

> "[f]or example, in an email dated August 7, 2019, ADAS shared with Cryptych what it asserted was an Additional Information request from CDRH. (Ref. 2 at 3)."

89.    A thorough examination of the emails labeled as "[r]ef. 2 at 3" reveals no suggestion or declaration from the Plaintiffs implying that the Additional Information Request was sent by CDRH. This discrepancy in CDRH's documentation is important, as it inaccurately represents the Plaintiffs' communications with Cryptych. The emails under scrutiny were formatted into PDF by FDA's senior counsel, Marci Norton, and appended to the Notice Memo. This misrepresentation casts doubt on the reliability and legitimacy of CDRH's claims in their Notice, Notice Memo, Opposition, and Final Order. To expose this inconsistency and provide clear evidence against CDRH's misleading account, the precise quotes from the Plaintiffs to Cryptych in "Ref. 2 at 3" from the Notice Memo are presented, demonstrating the absence of any indication by the Plaintiffs that the Additional Information Request originated from CDRH:

> i.    "[w]e have attached the Additional Information request for your 510(k) application. Please feel free to let us know if you would like to speak with us in order to clarify any questions that you may have about the attached A.I. request."
>
> ii.    "[w]e can speak with you on Thursday at 5:30 pm (US East Coast time). We will call you at that time. For the response method, we would need a complete response. If you send us partial responses, it could become difficult to manage when there are so many sub-questions."

> iii. "[i]t was nice speaking with you and your colleagues today.
> I think that we clarified many issues today in the A.I. request.
> Regarding the wireless coexistence testing, AAMI TIR69:
> 2017 "risk management of radio-frequency wireless coexist-
> ence for medical devices and systems" can be used to show
> whether you need to perform ANSI C63.27:2017 or not.
> https://my.aami.org/aamiresources/preview
> files/1704_TIR69Preview.pdf."

90.    Given the context and content of the three quotes above from the Plaintiffs´ emails to Cryptych, which were included with the Notice as "[r]ef. 2 at 3", it is difficult to comprehend how any reasonable interpretation could lead to the conclusion, that the Plaintiffs claimed that their Additional Information Request dated August 6, 2020, originated from CDRH. Each of the three quotes above clearly indicates that the information and requests were communicated directly by the Plaintiffs. The absence of any reference to CDRH, as the source of the Additional Information Request, within these quotes, underlines this point.

91.    This discrepancy raises questions about the basis of the allegations against the Plaintiffs. It suggests a misinterpretation of the Plaintiffs' communications by CDRH. The clarity and specificity of the Plaintiffs' statements in these quotes are indicative of their transparency in the 510(k) review process with Cryptych, and contradict the notion of any misleading assertions being made regarding the origin of the Additional Information Request. This misalignment between CDRH's claims, and the actual content of the Plaintiffs' communications, necessitates a reassessment of the conclusions drawn in the Final Order.

92.    CDRH's interpretation of the Plaintiffs' interactions with Cryptych, particularly concerning the source of the Additional Information Request, appears to be primarily based on an email from Komiyama to Pishko, dated February 7, 2020. This email influenced CDRH's perception, suggesting that the Plaintiffs had misrepresented the origin of the Additional Information Request to Cryptych. Komiyama's email, referenced in the Notice memo as "[r]ef. 2 at 1," encapsulates prior exchanges between the Plaintiffs and Cryptych and is described in the following excerpt:

> "[b]elow is the exchange that goes back to *August of last year*. It's
> a bit TL;DR but to summarize, this is (1) the interaction from ADAS
> asking for the additional information they need to make their rec-
> ommendation to FDA (2) the confirmation that ADAS had sent the
> file to FDA and (3) *the request for additional information from
> FDA*." (emphasis added).

93.    Hinton's decision to revoke the Plaintiffs´ accreditation, heavily predicated on Cryptych's prevaricating complaints, seems to overlook the clear and unambiguous nature of the Plaintiffs' communications. Specifically, the August 6, 2019, correspondence to Cryptych unambiguously indicated the source of the Additional Information Request as coming from ADAS, not CDRH. The lack of specific examples, or direct quotations, in the Final Order about the Plaintiffs´ Additional Information Request, where Hinton declares that the Plaintiffs misled Cryptych in their communications, prompts scrutiny. This apparent disregard for a clear exposition of facts, constitutes a violation of the thoroughness, impartiality, and reasoned decision-making principles enshrined in the APA. CDRH's reliance on Cryptych's flawed interpretation, in the face of direct evidence to the contrary, undermines the thoroughness and accuracy required in administrative evaluations under the APA. This situation underscores the necessity for a more meticulous and comprehensive review of the evidence, aligning with APA mandates that administrative decisions be grounded in a thorough and rational analysis of all pertinent facts.

**Komiyama´s Unconventional Access and Influence within CDRH**

94.    RQM+, the employer of Komiyama, actively promotes its ability to expedite 510(k) clearances with CDRH, primarily through using insider knowledge and connections. This unique edge is highlighted on RQM+'s website, stating: "[w]e bring a behind-the-scenes perspective from former FDA reviewers who know what is expected from manufacturers and how best to communicate with regulators." On February 27, 2020, the correspondence from Komiyama to the Plaintiffs exemplifies an instance of communication indicative of privileged access to confidential information held by CDRH, potentially bestowing an undue advantage upon Komiyama´s client, Cryptych:

> "***I spoke to a former colleague at FDA*** who said that Jay Gupta's group has responded to the early interaction request. Knowing that FDA has sent over the response to you, can you let me know when you will send the response to Vestech [Cryptych]." (emphasis added).

95.    Within the same correspondence, Komiyama mentions a dialogue with a "former FDA colleague," signifying access to confidential insights regarding CDRH's perspective on the Plaintiffs' safety concerns about the NuroChek. This access to CDRH's internal communications by Komiyama, raises questions about the impartiality and thoroughness of the regulatory review

process. Komiyama's capacity to foresee the official response from CDRH, as reflected in the email dated February 27, 2020, implies a compromise of established procedural integrity standards. This revelation about the decision-making processes within CDRH highlights the challenges in maintaining unbiased and ethical standards in regulatory approvals. It brings to light concerns regarding the fairness and objectivity of CDRH's actions. Incidents like the leakage of confidential information to Komiyama, elicit doubt on the integrity and impartiality of CDRH's regulatory procedures.

96.    Komiyama's ability to secure impromptu meetings with senior CDRH officials, such as Pishko, bypassing the standard procedural requirements, is a notable deviation from typical administrative practices. This is particularly evident in an email dated March 10, 2020, where Komiyama disclosed an unplanned meeting with CDRH's Third-Party Review team. The email reads:

> "[j]ust met with the Third Party review team at FDA (I was there for another meeting) and thought I'd check in on how things are going with the memo? They said they had not yet received anything from ADAS so wanted to check in and see if we're still on track for a recommendation today?"[12]

97.    The Plaintiffs' "early interaction request" to CDRH on February 21, 2020 (ID: GEN 2000110), following the February 13 teleconference, focused on addressing major usability issues with the NuroChek device. Central to this request was a usability test report from Cryptych, dated January 30, 2020, which highlighted significant errors in fitting the NuroChek headset. The report specifically noted, "[p]articipants UT1, UT8 and UT13 positioned the headset lower than optimal on the posterior of the mannequin head on initial fitting and were unable to reposition it satisfactorily." This indicated that 20% of participants (3 out of 15) failed to correctly place the NuroChek headset on a mannequin's head, a crucial step for the device's operation. This error rate suggests potential for even higher difficulties in positioning the headset on actual patients.

98.    CDRH's response, dated February 26, 2020, to the Plaintiffs' "early interaction request" indicated their acceptance of the NuroChek's 20% error rate, which was a cause for concern for the Plaintiffs. CDRH's statement, "[p]resumably, the pass rate of 12/15 met the acceptance

---

[12] Komiyama's reported ease of movement within CDRH's Silver Springs, Maryland campus, typically a privilege exclusive to CDRH staff, suggests deviations from standard access control protocols.

criteria," contrasts sharply with the strict safety standards usually applied to medical device assessments. Aguila notes that this apparent leniency in CDRH's evaluation, in his experience, diverges from their typical approach to medical device scrutiny, raising serious questions about the consistency and rigor of CDRH's assessment criteria, particularly in the case of the NuroChek device. This position by CDRH seems to suggest a relaxation of the stringent examination typically expected in such important safety evaluations.

99.    The emails involving Komiyama uncovers a notably high level of access to confidential CDRH data, raising questions about the impartiality and thoroughness of the regulatory review process. Komiyama´s ability to engage directly with CDRH officials, especially those from the "Division of Neurosurgical, Neurointerventional, and Neurodiagnostic Devices" who are integral to final clearance decisions, amid the ongoing review of a 510(k) submission such as NuroChek, signals an alarming deviation from standard operating procedures at CDRH.

## CDRH'S LEGAL AND REGULATORY MISSTEPS

### CDRH's Improper Disclosure of Confidential Information in their Notice Memo: A Breach of 5 U.S.C. § 552(b)(4)

100.    CDRH's decision to publicly disclose parts of Aesculap, Inc.'s 510(k) submission (K032059) without following standard disclosure procedures, represents a clear violation of 5 U.S.C. § 552(b)(4). The use of the K032059 submission to support CDRH's rationale for revoking the Plaintiffs' accreditation raises significant legal issues due to the mishandling of confidential and proprietary information contained in that 510(k) submission. This disregard for established procedures in handling the K032059 submission further exemplifies CDRH's pattern of selective and inconsistent enforcement. According to 21 C.F.R. § 20.23, CDRH must adhere to a specific process before making any portion of a 510(k) submission public, typically involving a Freedom of Information Act (FOIA) request and mandatory redaction of sensitive commercial information. This process is usually lengthy due to resource constraints at CDRH.

101.    CDRH hastened the release of Aesculap's 510(k) information, bypassing the criteria outlined in 21 C.F.R. § 20.44 for expediting FOIA requests, as the exceptions in this regulation were not applicable. The swift disclosure of K032059, especially the part alleged to be Kobel's signature, is a departure from typical CDRH procedures. Additionally, CDRH seems to have

overlooked the requirements of 21 C.F.R. § 20.61 and Executive Order 12600, which mandate that the concerned party, Aesculap, Inc., in this instance, must be notified and consulted prior to the release of their confidential 510(k) data as part of a pre-disclosure notification (PDN). The inclusion of Aesculap's 510(k) details in CDRH's Notice Memo calls into question whether Aesculap was given an appropriate opportunity to review and react, as required by these regulations.

102.    Following the filing of their Notice on March 12, 2021, CDRH temporarily made K032059 accessible in their FOIA electronic reading room, a usual practice for 510(k) submissions made public after a FOIA request. However, although CDRH's FOIA electronic reading room has since been discontinued, replaced by direct access to released 510(k) submissions through CDRH's 510(k) database, K032059 is no longer available on FDA's website. This could suggest that the FOIA department at CDRH recognized the release of this 510(k) submission did not adhere to appropriate protocols and consequently removed it from public access.

**Misuse of CDRH Guidance Documents in the Accreditation Revocation Decision**

103.    The Final Order against the Plaintiffs contains a procedural error by using the Third-Party Review guidance document finalized on March 12, 2020. This is problematic because the key interactions and emails with Cryptych took place before this guidance was issued. Specifically, the Plaintiffs were part of a teleconference with CDRH and Cryptych on February 13, 2020, which Cryptych covertly recorded. During this meeting, any confusion Cryptych had about their reviewer was addressed. This meeting happened nearly a month before the new 2020 guidance came into effect. Thus, it would have been more accurate for CDRH to assess Cryptych's complaints based on the 2004 guidance, which was in effect on February 13, 2020, instead of using the 2020 guidance.

104.    Furthermore, the 2020 guidance document is explicitly advisory, as stated by FDA: "[t]his guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public." Given its advisory nature, using this guidance as grounds for revoking the Plaintiffs' accreditation is a procedural misstep and breaches the 'arbitrary and capricious' standard outlined in the APA under 5 U.S.C. § 706(2)(A). CDRH's reliance on an advisory document for meaningful decisions, such as accreditation revocation, indicates a misinterpretation of the role and legal authority of guidance documents in administrative decision-making.

105.    Imposing penalties based on optional guidance documents contradicts the fair notice principle in administrative law, which mandates that regulated entities, like the Plaintiffs, must be clearly informed about the behavior that could lead to enforcement action. Treating non-legislative rules as binding, without undergoing the necessary notice-and-comment rulemaking process, defies the non-legislative rule doctrine. This doctrine requires that entities are given adequate notice of the rules and potential consequences, ensuring fairness and transparency in administrative proceedings.

106.    In the Final Order, Hinton's use of guidelines from the International Medical Device Regulators Forum (IMDRF) to define the Plaintiffs' alleged misconduct raises legal and procedural concerns. The advisory status of IMDRF guidelines casts doubt on their enforceability and relevance within the U.S. legal context, potentially indicating an overextension of CDRH's legal authority. Employing these international guidelines to interpret vague terms like "generally accepted professional and ethical business practices" is problematic in the framework of U.S. law. This reliance on international standards to assess U.S. regulatory compliance may lead to a misapplication of domestic legal principles. Moreover, CDRH's use of such broad and undefined standards, as per the APA, could be viewed as arbitrary and capricious. It suggests enforcement based on discretion without a foundation in solid, legally established grounds.

107.    There is a clear inconsistency in how CDRH has enforced section 523 of the FD&C Act, particularly in its actions against the Plaintiffs. ADAS is the only Third-Party Review Organization subjected to involuntary removal under this statute. This targeted enforcement against ADAS stands in stark contrast to FDA's recognition of more severe issues within the broader Third-Party Review Program. Such selective application raises doubts about potential bias. These concerns are heightened by a February 17, 2010, Wall Street Journal article citing an internal FDA memo that raised questions about the expertise and methods of other Third-Party reviewers. The memo noted, "FDA also has concerns about abuses in its third-party review program. It says third-party reviewers often lack expertise and 'often just repeat what is in the submission' from the device company without analyzing it." Despite these noteworthy public health concerns identified by FDA regarding other 3PROs essentially acting as rubber stamps for their clients, only ADAS has faced such punitive actions, hinting at an uneven application of CDRH's regulatory enforcement.

108.    In the internal CDRH document titled "CDRH Preliminary Internal Evaluations – Volume 1," published in August 2010, CDRH cited a specific instance where a Third-Party Review

Organization jeopardized public health through inadequate review practices. Remarkably, this organization, as detailed in CDRH's own words below, never faced accreditation revocation:

> "[a]n accredited third party received a 510(k) for a picture archiving and communication system (PACS) device containing nine new software modules and with multiple indications for use. ... When FDA received the third-party review, it included only the name and 510(k) number of each predicate cited in the 510(k). It provided no analysis of the similarities and differences between the new device and its twelve predicates in terms of intended use, technological characteristics, or performance."

109.    A more comprehensive report detailing issues and risks associated with other Third-Party Review Organizations was published in May 2007 by Andrew C. von Eschenbach, the former Commissioner of Food and Drugs. Titled "Third Party Review of Medical Device Premarket Notifications," this report seems to have been removed from CDRH's website. Consequently, the Plaintiffs will need to request a copy of this report during the discovery phase of the legal proceedings.

110.    CDRH's decision to revoke the Plaintiffs' accreditation, grounded in the misapplication of non-binding guidance documents and without substantial evidence of the Plaintiffs misleading Cryptych, casts doubt on the decision's legitimacy. This situation warrants a reassessment in line with established regulatory and legal frameworks, ensuring compliance with the APA standards, and upholding the principles of fair notice and non-arbitrary administrative action.

## ASSESSING THE IMPACT ON PUBLIC HEALTH

### Assessing the Public Health and Diversity Impact of the Accreditation Revocation

111.    The revocation of the Plaintiffs' accreditation in the 510(k) Third-Party Review Program by CDRH has far-reaching implications, affecting not only the Plaintiffs but also the broader medical device review system, particularly in terms of the involvement of minority reviewers. These non-Caucasian reviewers play a crucial role in maintaining the integrity and thoroughness of regulatory oversight, which is essential for public health and safety. The removal of the Plaintiffs compromises the diversity and depth of medical device assessments, key factors in protecting public health interests. This action impacts not just the Plaintiffs but also has wider consequences for the inclusivity and thoroughness of medical device regulatory reviews.

112.    CDRH's publication "Approach for Improving the Performance Evaluation of Pulse Oximeter Devices Taking Into Consideration Skin Pigmentation, Race and Ethnicity," issued on November 16, 2023, highlights a safety gap in medical devices for patients of different racial groups. The report reveals that pulse oximeters, previously cleared by FDA's 510(k) process, show reduced accuracy in African-American patients, attributed to a lack of racial diversity in safety test participants. Such an oversight by FDA reviewers who approved these oximeters, had dire consequences, especially during the COVID-19 pandemic, contributing to higher mortality rates in African American communities.[13] As a minority-led organization, the Plaintiffs have been advocates for inclusive medical device testing to ensure safety across diverse populations. Their absence as Accredited Persons risks omitting crucial perspectives in future medical device evaluations.

113.    Further, the Plaintiffs' accreditation revocation impacts initiatives promoting diversity in the field. On January 4, 2021, they proposed to Pishko, then Assistant Director of CDRH's 3PRO Program, an outreach program to high school students in disadvantaged minority communities. The Plaintiffs' stated goal was to recruit and motivate these students to study science or engineering and eventually work as FDA reviewers. Pishko's lukewarm response on January 5, 2021, "[w]e certainly support your effort in spirit to outreach to [sic] disadvantaged students. At this time, our team doesn't have the ability to provide you resources. Best of luck, Greg," and the subsequent accreditation revocation, suggests that this proposal might have unintentionally escalated tensions with Pishko, contributing to the strained relationship with Pishko and eventual removal of the Plaintiffs' accreditation. This outcome not only affected the Plaintiffs' operational capabilities, but also hinders efforts to address the lack of diversity among FDA reviewers, representing a consequential setback for inclusivity initiatives and diminishing the representation of minority groups in public health regulatory roles.

**Examining CDRH's Practices in 510(k) Submission Withdrawals**

114.    In their Notice Memo, CDRH asserted, "it is not CDRH's practice to ask sponsors to withdraw a 510(k) submission in this situation, purportedly involving an additional information

---

[13] SpO2 sensors often inaccurately read African-American patients' oxygen levels due to melanin interference, leading to delayed oxygen treatment. The study "Racial and Ethnic Discrepancy in Pulse Oximetry and Delayed Identification of Treatment Eligibility Among Patients With COVID-19," published in the Journal of the American Medical Association on May 31, 2022, explores this issue in more detail.

request." This claim was later contradicted by evidence from the Plaintiffs in its April 27, 2021 reply, leading to this CDRH claim being removed in the Final Order by Hinton. The Plaintiffs highlighted a contradiction in CDRH's claim by citing a June 27, 2019, email where CDRH in-house reviewer Patrick Antkowiak advised, "I forgot to add that if the 510(k) submitter *would not like to receive an NSE letter*, they may withdraw the 510(k) submission." (emphasis added). This statement contradicts CDRH's original assertion, indicating that CDRH reviewers do, in fact, suggest withdrawals to avoid sending NSE letters.[14]

115.    According to CDRH's MDUFA IV Performance Report, dated March 17, 2021, it reveals a notable statistical disparity where in 2019, there were only 110 NSE decisions, compared to 207 withdrawals of 510(k) submissions. This data implies a potential preference by CDRH in-house reviewers for facilitating withdrawals, instead of issuing labor-intensive NSE letters. Crucially, the existing "Training Curriculum for Third-Party Reviewers," as endorsed by CDRH, lacks specific guidance on advising against withdrawals in cases where 510(k) submissions are deemed insufficient. This omission signals a gap in the training material provided to Third-Party reviewers. Additionally, CDRH cites in their Notice Memo from March 12, 2021, an internal FDA SharePoint document titled "Documenting & Processing Withdrawal Requests (#04006)" as part of its training framework. However, this document is inaccessible to Third-Party reviewers, who do not have access to FDA's internal SharePoint system. This situation indicates an implicit expectation from CDRH for Third-Party reviewers to adhere to unseen and inaccessible guidelines, raising concerns about the fairness and transparency of CDRH's training program for Third-Party Review Organizations.

116.    Traditionally, Third-Party reviewers were not responsible for providing status updates to 510(k) applicants, a role not emphasized in CDRH's training material. In fact, it was only in 2022 that CDRH introduced the "Progress Tracker for Premarket Submissions," indicating that such updates were not previously a mandated part of Third-Party reviewer duties.

117.    CDRH's original claim in the Notice, as shown in the quote below, and its subsequent exclusion in the Final Order by Hinton, reveals inconsistencies in their enforcement and interpretation of internal practices. This inconsistency, coupled with the reliance on inaccessible internal training documents, and the lack of clear guidelines in the Third-Party reviewer training

---

[14] "NSE" stands for "Not Substantially Equivalent," a term used in regulatory contexts to indicate a rejection decision on a 510(k) submission.

curriculum, highlights procedural irregularities and unfairness in the regulatory process overseen by CDRH:

> "[t]These communications concerned CDRH because *it is not CDRH's practice to ask sponsors to withdraw a 510(k) submission in this situation...*" (emphasis added).

### Investigation by NIH´s Research Integrity Office on Pishko's Ph.D. Plagiarism

118.    The detection of plagiarism in Pishko's Ph.D. thesis is a serious violation of academic and ethical principles. This significant academic dishonesty caught the attention of Dr. Kathryn Partin, Director of Research Integrity at the National Institutes of Health (NIH). Due to the severity of his plagiarism, NIH commenced an investigation into Pishko's actions, emphasizing the severity of such ethical violations. This scrutiny by a respected institution like NIH, underscores the seriousness of the allegations and underscores the necessity for accountability in academic misconduct cases. The evidence of Pishko's academic misconduct, evident in the unauthorized replication of content from earlier academic publications, indicates a concerning pattern. Yet, CDRH's inaction regarding Pishko, despite apparent copyright violations, sharply contrasts with its prompt measures against the Plaintiffs.

119.    Pishko's approach to fundamental administrative duties further underscores his disregard for ethical conduct. His intentional failure to adhere to the mandated 60-day timeline for the Plaintiffs' re-accreditation decision, under the pretext of the COVID-19 pandemic, is demonstrably false as evidenced by the timely re-accreditation of other Accredited Persons during the same period. Moreover, Pishko's lack of response to Reifschneider's complaint about sexual harassment and misgendering is troubling. By not forwarding this serious complaint to the appropriate CDRH department for investigation, Pishko neglected his duty to address crucial workplace issues and uphold a safe, respectful work environment. Such negligence reflects poorly on Pishko´s commitment to ethical conduct and proper administrative procedure, essential qualities for high-ranking government officials.

120.    The accumulation of these incidents – intentionally violating the statutory deadline in re-accreditation decision-making, falsely blaming the re-accreditation delay on COVID-19 when the real reason was the delay in getting the signature on Kobel´s declaration, and the mishandling of internal complaints – collectively paint a disturbing picture of Pishko's professional behavior. They indicate a consistent deviation from the ethical standards expected of a senior official in a

public health institution. This pattern of behavior not only undermines the integrity of Pishko's leadership but also raises questions about the reliability of the processes and decisions he supervised. Such conduct by Pishko carries weighty implications, impacting not just the Plaintiffs but potentially the overall efficacy and trustworthiness of CDRH's operations.

## DAMAGES

### Economic Impact Analysis: Direct and Indirect Losses Due to Accreditation Revocation

121.    The Plaintiffs have suffered extensive economic losses due to the accreditation revocation by CDRH. As detailed in their SF 95 claim, filed on or about May 17, 2023, these losses total $120,000, split between tangible business losses and intangible personal impacts, including reputational harm and lost opportunities.

122.    The tangible losses of $60,000 reflect the direct financial impacts on the business. This includes disruptions to operations, project cancellations or downscaling, and resource loss, all of which affected ADAS's financial health and operational capabilities.

123.    The intangible losses, also valued at $60,000, include severe reputational damage, which is particularly harmful in industries where credibility is crucial. This loss of reputation has led to decreased confidence from clients, adversely affecting future business. Additionally, mental anguish and stress from professional uncertainty and the loss of potential new contracts further impact the long-term sustainability of the business. These intangible losses have a lasting effect on the Plaintiffs' professional standing and future prospects, exacerbated by the abrupt and procedurally unfair revocation of accreditation.

### Personal Economic Impact on Aguila from the Accreditation Revocation

124.    Aguila, as the sole proprietor of ADAS, has faced personal economic losses due to the actions of Pishko at CDRH. His financial stability and professional career were closely tied to ADAS's role as a 510(k) Third-Party Review Organization.

125.    The loss of accreditation directly impacted Aguila's primary source of income. As ADAS's sole focus was Third-Party Reviews, the revocation halted all ongoing and planned review projects, leading to immediate and substantial income loss for Aguila.

126.    Furthermore, the revocation damages Aguila's professional reputation in the Third-Party review sector, adversely affecting both current and future earning potential. This diminished professional standing limits Aguila's opportunities for similar roles or engagements.

127.    In addition to financial losses, Aguila has endured mental anguish due to the unexpected cessation of his business. The consequent stress, combined with reputational harm, has caused personal distress.

128.    Aguila has experienced considerable financial and business income losses, and mental anguish, directly linked to Pishko's actions leading to the accreditation revocation. These losses extend beyond immediate income loss, impacting Aguila's long-term earning capacity and professional reputation in the medical device review sector.

## Aguila's Legal Eligibility as an "Accredited Person" under 21 U.S.C. § 360m

129.    Rafael Aguila, as the sole proprietor of Advanced Device Approval Services (ADAS), meets the legal criteria for accreditation under 21 U.S.C. § 360m(b)(3)(C). The sole proprietorship structure merges Aguila and ADAS into a single legal entity. As such, Aguila is positioned as a "legally constituted entity permitted to conduct the activities for which it seeks accreditation," fulfilling the statute's requirements. Furthermore, while 21 U.S.C. § 360m(b)(3)(A) excludes Federal Government employees from being "Accredited Persons," it does not disqualify private individuals like Aguila. His active involvement in ADAS's review processes and decision-making further solidifies his role as an Accredited Person.

130.    The principle of substance over form, emphasizing actual contributions rather than organizational structure, supports Aguila's status as an "Accredited Person." Before the Final Order on August 13, 2021, Aguila, through his sole proprietorship, had control over ADAS LLC. Aguila's exclusive ownership and management of ADAS underscore his continuous authority and responsibility in the organization. This structure not only ensures legal and operational alignment but also fulfills the requirements of 21 U.S.C. § 360m, validating his eligibility for the role.

## FIRST CLAIM FOR RELIEF

### Violation of Procedural Rights Under the Administrative Procedure Act (APA) and Non-Compliance with 21 U.S.C. § 360m(b)(2)(B) Requirements

131.    The Plaintiffs reassert and incorporate by reference paragraphs 1 through 130 of this complaint as if fully detailed herein.

132.    The APA empowers courts to invalidate Agency actions deemed "arbitrary and capricious," "not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations," as per 5 U.S.C. § 706(2).

133.    CDRH's failure to offer a hearing before revoking the Plaintiffs' accreditation as "Accredited Persons" contradicts the procedural requirements of 21 U.S.C. § 360m(b)(2)(B), constituting a breach of statutory duties and the Plaintiffs' APA rights.

134.    CDRH's disregard of 5 U.S.C. § 557(b), which mandates a fair opportunity for a hearing, undermines due process and fair play, essential in administrative law.

135.    The absence of an hearing led to irreparable harm to the Plaintiffs, including reputational damage and lost business opportunities.

136.    This claim seeks to enforce CDRH's compliance with statutory obligations, preserving regulatory integrity and protecting the rights of Accredited Persons.

137.    Under the APA (5 U.S.C. § 554), certain cases require formal adjudication, including a hearing by Administrative Judges ("AJ"), ensuring a fair and transparent process where significant property rights, like in this matter, are involved.

138.    The revocation of accreditation impacts substantial property rights, necessitating a hearing before an AJ under constitutional due process.

139.    The revocation by CDRH is "not in accordance with law," "in excess of statutory jurisdiction," warranting annulment under 5 U.S.C. § 706(2)(A), (C).

140.    Pishko's investigation into ADAS, initiated after Reifschneider's complaint, represents an arbitrary and capricious action under 5 U.S.C. § 706(2)(A). The timing suggests retaliatory motives, questioning the impartiality of the investigation and violating APA standards.

141.    By not conducting a required informal hearing, CDRH exceeded its statutory authority, ignoring procedural guidelines in 21 U.S.C. § 360m(b)(2)(B).

142.    CDRH's decision failed to observe procedural law, particularly the mandate for a hearing, signifying non-compliance with due process under 5 U.S.C. § 706(2)(D).

143.    The decision to revoke accreditation lacks substantial evidence, failing to justify its action adequately, including no affidavits or declarations from CDRH officials, under 5 U.S.C. § 706(2)(E). CDRH also overlooked significant disputed facts raised by Aguila in his signed declaration from the reply dated April 27, 2021, and the request for a hearing dated March 26, 2021.

144.    CDRH's revocation decision was unwarranted by the facts, indicating a disconnect from the situation's realities and requirements, as per 5 U.S.C. § 706(2)(F).

## SECOND CLAIM FOR RELIEF

**Violation of Timeliness Requirement Under the APA – Unwarranted Delay in
Re-Accreditation Decision by CDRH, in Contravention of 21 U.S.C. § 360m(b)(2)(D)(ii)**

145.    The Plaintiffs reassert and incorporate by reference paragraphs 1 through 130 of this complaint as if fully detailed herein.

146.    This Claim for Relief under the Administrative Procedure Act (APA) addresses CDRH's failure to meet the timeliness requirement for re-accreditation decisions outlined in 21 U.S.C. § 360m(b)(2)(D)(ii), applicable to 510(k) Third-Party Review Organizations.

147.    CDRH did not adhere to the 60-day statutory deadline for re-accreditation decisions as mandated by 21 U.S.C. § 360m, significantly impacting the Plaintiffs' operations.

148.    The Plaintiffs submitted their re-accreditation application on September 10, 2020.

149.    On November 9, 2020, 60 days after submission, CDRH acknowledged the receipt of the application, yet failed to make a decision.

150.    CDRH's rejection of ADAS's re-accreditation on March 17, 2021, occurred 128 days post-application, exceeding the statutory timeframe and breaching procedural obligations.

151.    The Plaintiffs allege Pishko's delay in decision-making was intentional and in bad faith, falsely attributed to COVID-19 impacts, while awaiting the Kobel declaration that was signed on February 27, 2021. This stands in contrast to the timely processing of other 3PROs' re-accreditation applications within the same period.

152.    This excessive delay caused significant harm to the Plaintiffs, including financial and professional damages, reputational harm, and business disruptions.

153.    The delayed decision and Pishko's misleading conduct constitute arbitrary, capricious actions and abuse of discretion under the APA.

154.    This Claim for Relief calls for CDRH's adherence to statutory deadlines and procedural fairness, emphasizing accountability and transparency in regulatory actions affecting parties in the medical device review sector, like the Plaintiffs.

## THIRD CLAIM FOR RELIEF

**Violation of the Federal Tort Claims Act (FTCA) –
Negligent or Wrongful Act of a Federal Employee**

155.    The Plaintiffs reassert and incorporate by reference paragraphs 1 through 130 of this complaint as if fully detailed herein.

156.    Aguila, as the sole proprietor of Advanced Device Approval Services (ADAS), holds a definitive legal and financial interest in the entity. Additionally, the ADAS sole proprietorship owns and controls ADAS LLC, further solidifying Aguila's direct stake in these business entities. This ownership structure not only establishes Aguila's personal interest in the entities but also confers upon him a legal standing. This standing is crucial in asserting his right to pursue legal remedies for any damages or injuries incurred by these entities. By clearly establishing Aguila's vested interest and the potential for direct harm, these facts support his legal capacity to seek redress under the principles of standing and injury as recognized in corporate and civil law.

157.    The Plaintiffs allege direct economic and professional harm due to the misconduct of Pishko, a federal employee at CDRH. This harm includes damage to the Plaintiffs' business operations and financial stability.

158.    Prior to this lawsuit, the Plaintiffs pursued all administrative remedies, including submitting the SF 95 to FDA, addressing Pishko's alleged wrongful acts. The lack of satisfactory response from FDA necessitates this legal action under the FTCA.

159.    In compliance with FDA's Staff Manual Guide 2260.1, the Plaintiffs submitted a Standard Form 95 (SF 95) to FDA on or about May 17, 2023. This submission met the regulatory mandate to file at least six months prior to starting this legal proceeding, and was within the two-year statutory limit from the claim's accrual date of August 13, 2021.

160.    The SF 95 outlines economic losses due to Pishko's actions, detailing $60,000 for property damage and an additional $60,000 for personal injuries, totaling $120,000 in claimed damages.

161.    The Plaintiffs have met all procedural and substantive FTCA requirements, expecting a fair resolution from federal authorities.

162.    Pishko's improper interference led to substantial economic damage, including lost business opportunities and reputational harm.

163.    There is a direct causal link between Pishko's actions and the Plaintiffs' economic harm, supporting this FTCA claim.

164.    The Plaintiffs assert that Pishko's investigation into ADAS and Kobel, initiated after Reifschneider's complaint, was retaliatory. The investigation's timing and the revocation of

ADAS's accreditation suggest it was driven by personal animus. This potential abuse of authority by Pishko, a federal employee, constitutes a violation of the FTCA.

165.    From August 20, 2018, to August 13, 2021, the Plaintiffs, as "Accredited Persons" under 21 U.S.C. § 360m, efficiently conducted at least 31 reviews for CDRH. The revocation of their accreditation resulted in quantifiable economic losses, impacting both immediate and future revenue streams, causing significant financial setbacks.

## FOURTH CLAIM FOR RELIEF

### Breach of Procedural Due Process Rights under the Fifth Amendment

166.    The Plaintiffs reassert and incorporate by reference paragraphs 1 through 130 of this complaint as if fully detailed herein.

167.    This claim is based on the alleged violation of the Fifth Amendment's Procedural Due Process rights of the Plaintiffs by CDRH and its officials. CDRH's actions have led to procedural irregularities and infringements upon the Plaintiffs' constitutional rights..

168.    The claim stems from CDRH's Final Order issued on August 13, 2021, which improperly applied federal court summary judgment standards without a hearing. Hinton, the author of the Order and lacking formal legal training, misapplied these principles, overlooking substantial factual disputes essential in summary judgments, thus violating procedural due process. The decision to deny a hearing and confront accusers further compounds this violation.

169.    Pishko's demotion associated with his misconduct against the Plaintiffs, adds credibility to their claims, indicating procedural irregularities in CDRH's accreditation revocation process and violating due process standards.

170.    CDRH's failure to adhere to the 60-day re-accreditation deadline and providing misleading excuses for the delay exemplify procedural due process violations, undermining the regulatory process's integrity.

171.    Pishko's unethical behavior, contributing to the revocation of accreditation, reflects a pattern of procedural neglect and breaches procedural due process.

172.    The Plaintiffs argue that CDRH's revocation of their accreditation is a deprivation of property without due process, violating the Fifth Amendment. The abrupt cancellation of accreditation without a fair hearing infringes upon the Plaintiffs' established property rights, contravening the due process protections of the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that the Court:

1) Find that the revocation of ADAS's accreditation by CDRH on August 13, 2021, was unlawful and not in accordance with the Administrative Procedure Act (APA), the Fifth Amendment, and other applicable laws and regulations.

2) Order CDRH to immediately reinstate the accreditation of the Plaintiffs as Accredited Persons under 21 U.S.C. § 360m.

3) Compensate the Plaintiffs for all financial losses incurred because of the unlawful revocation of accreditation, in an amount to be determined at trial.

4) Require the Defendants to pay all legal costs and attorneys' fees incurred by the Plaintiffs in bringing this action.

5) Issue a permanent injunction restraining CDRH and its agents, employees, and representatives from further unlawful actions against the Plaintiffs.

6) Mandate a fair and impartial hearing before an Administrative Judge, as required under the APA and the Fifth Amendment, to adjudicate any disputes or claims related to the revocation of the Plaintiffs´ accreditation.

7) Direct CDRH to implement appropriate corrective measures to ensure compliance with established legal and regulatory standards, and to prevent recurrence of similar procedural violations in the future.

8) Provide any other relief that the Court deems just and appropriate.

The Plaintiffs submit this prayer for relief in the interest of justice, due process, and the integrity of the regulatory process governing medical device reviews.

Dated: December 7, 2023

Respectfully submitted,

**RAFAEL AGUILA, pro se**

Owner of ACCELERATED DEVICE
APPROVAL SERVICES (a sole proprietorship)

Address: 3253 S.W. 25th Street
Miami, FL 33155
Phone:   786-633-2008
Email:   support@510k-review.com